AO 91 (Rev. 11/11) Criminal Complaint                    AUSA Amy Koehler (312) 886-2038



## UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

<table>
<tr><td>UNITED STATES OF AMERICA<br><br>v.<br><br>WILLIAM DODDS</td><td>CASE NUMBER: 26 CR 340</td></tr>
</table>

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief. On or about September 23, 2024, at Skokie, in the Northern District of Illinois, Eastern Division, the defendant WILLIAM DODDS violated:

| Code Section | Offense Description |
|---|---|
| Title 21, United States Code, Section 841(a)(1) | Did knowingly and intentionally possess with intent to distribute a controlled substance, namely, 400 grams or more of a mixture and substance containing a detectable amount of fentanyl, (N-phenyl-N-[1-(2-phenylethyl)-4-piperidinyl] propanamide), a Schedule II Controlled Substance |

This criminal complaint is based upon these facts:

 X   Continued on the attached sheet.

*Michael Ganley*

MICHAEL GANLEY
Special Agent, Federal Bureau of Investigation (FBI)

Pursuant to Fed. R. Crim. P. 4.1, this Complaint is presented by reliable electronic means. The above-named agent provided a sworn statement attesting to the truth of the Complaint and Affidavit by telephone.

Date: June 29, 2026

_____
*Judge's signature*

City and state: Chicago, Illinois

GABRIEL A FUENTES, U.S. Magistrate Judge
*Printed name and title*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

## **AFFIDAVIT**

I, MICHAEL GANLEY, being duly sworn, state as follows:

1.　　I am a Special Agent with the Federal Bureau of Investigation (FBI) and have been so employed since approximately January 2020. My current responsibilities include the investigation of violent crimes and narcotics trafficking offenses.

2.　　This affidavit is submitted in support of a criminal complaint alleging that WILLIAM DODDS ("DODDS") has violated Title 21, United States Code, Section 841(a)(1). Because this affidavit is being submitted for the limited purpose of establishing probable cause in support of a criminal complaint charging DODDS with possession with intent to distribute 400 grams or more of fentanyl, in violation of Title 21, United States Code, Section 841(a)(1), I have not included each and every fact known to me concerning this investigation. I have set forth only the facts that I believe are necessary to establish probable cause to believe that the defendant committed the offense alleged in the complaint.

3.　　This affidavit is based on my personal knowledge, my training and experience, my review of audio-video recordings, my review of judicially authorized intercepted wire communications, and information provided to me by other law enforcement agents.

## I.   FACTS SUPPORTING PROBABLE CAUSE

### A.   Summary

4.   In or around January 2023, law enforcement began investigating Drug Trafficker A for distributing fentanyl, heroin, and cocaine in the Hazel Crest and Chicago areas. As part of that investigation, law enforcement began investigating DODDS as a potential supplier of narcotics to Drug Trafficker A.

5.   In furtherance of DODDS' drug trafficking activity, DODDS has used at least two different phone numbers, one of which answers to (773) ***-0871 ("Target Phone 2"), and is subscribed to "Coast to Coast Construction" at 46 Englewood Avenue in Bellwood, Illinois, and one of which answers to (773) ***-9462 ("Target Phone 3"), with no subscriber information, and operated on the network of AT&T.[1]

---

[1] Law enforcement identified DODDS as the user of Target Phone 3 based on the following: On or about April 12, 2024, law enforcement intercepted a call between Drug Trafficker A, who was using Target Phone 1 (interceptions were authorized by Acting Chief Judge Manish S. Shah for Target Phone 1 for a period of 30 days on March 22, 2024), and DODDS, who was using Target Phone 2. During that call, DODDS told Drug Trafficker A that DODDS would contact Drug Trafficker A from another line. Approximately one minute later, Drug Trafficker A received an incoming call from Target Phone 3, but the call went to voicemail. Immediately after that call, Drug Trafficker A received another incoming call from Target Phone 3. Drug Trafficker A had a conversation with an individual using Target Phone 3 that law enforcement identified as DODDS by comparing the voice of the user of Target Phone 3 to DODDS' voice that they had previously heard on the intercepted calls over Target Phone 1 and Target Phone 2.

Law enforcement identified DODDS as the user of Target Phone 2 based on the following: Target Phone 2 is subscribed to "Coast to Coast Construction" at an address in the 40th block of Englewood Avenue in Bellwood, Illinois. According to law enforcement databases, the same address is a residential address for DODDS. Additionally, according to Illinois Secretary of State records, DODDS is listed as the president of "Coast to Coast 1 Construction." The business address for Coast to Coast 1 Construction is the same address in Bellwood, Illinois. Law enforcement recognizes that the subscriber information for Target Phone 2 does not include the number "1" in reference to Coast to Coast 1 Construction. However, law enforcement believes, based on their knowledge of the investigation, that the subscriber name for Target Phone 2 is the same business listed in the Illinois Secretary of State records that DODDS is listed as the president of because the names are the same besides the number

6.      On or about May 15, 2024, Chief Judge Rebecca Pallmeyer authorized law enforcement to intercept wire communications for a period of 30 days over Target Phone 2.

7.      On or about September 13, 2024, Chief Judge Virginia M. Kendall authorized law enforcement to intercept wire communications for a period of 30 days over Target Phone 3.

8.      In summary, while law enforcement intercepted wire communications over Target Phone 3, they overheard multiple conversations between DODDS and unknown individuals regarding DODDS' travel to the Los Angeles, California area where he appeared to meet with two different individuals to replenish his drug supply, as described below. Following this trip to Los Angeles, on or about September 23, 2024, based on law enforcement surveillance and intercepts over Target Phone 3, DODDS traveled to a shipping company warehouse (Business A) in Skokie, Illinois, to pick up three parcels containing narcotics that DODDS had purchased and had shipped from the Los Angeles area to Illinois. Shortly after DODDS arrived at

---

"1," and the addresses for both the subscriber for Target Phone 2 and the company listed with the Illinois Secretary of State are the same. Further, I believe that DODDS is the user of Target Phone 2 based on the wire intercepts over Target Phone 1, Target Phone 2, and surveillance. For example, in calls where DODDS and Drug Trafficker A discussed meeting up, law enforcement surveillance observed DODDS and Drug Trafficker A together shortly thereafter. One specific example occurred on April 2, 2024. Specifically, law enforcement intercepted a call on that date, where Drug Trafficker A, using Target Phone 1, called DODDS, at Target Phone 2, and asked, "Where you at?" DODDS responded, "Still at the restaurant." Drug Trafficker A replied, "I am leaving here." Approximately thirty minutes later, law enforcement observed Drug Trafficker A arrive at and enter Restaurant B. Law enforcement further observed Drug Trafficker A meet with DODDS at Restaurant B. Further, law enforcement has compared observations of the user of Target Phone 2 with an Illinois Secretary of State photograph of DODDS and determined that they are the same person.

Business A and paid the shipping for the three parcels, law enforcement officials arrested DODDS, temporarily detained him, and seized the parcels.

**B. On or about September 17, 2024, DODDS Obtained Narcotics in California**

9. According to Target Phone 3's location information, DODDS traveled from Chicago to the Los Angeles area from on or about September 17, 2024, through on or about September 20, 2024.

10. According to intercepts over Target Phone 3, on or about September 17, 2024, and September 19, 2024, DODDS met with two separate narcotics suppliers while in California to obtain different types of narcotics.

11. For example, according to intercepts over Target Phone 3, on or about September 17, 2024, at approximately 8:39 a.m., DODDS, using Target Phone 3, called (323) ***-1014, a phone number subscribed to Individual A at an address on West 77th Street in Los Angeles, California ("Subject Phone 9"). DODDS stated, "Just got over [arrived] this way [in Los Angeles]. I'm probably do a short order [of narcotics]. I'm a probably grab 2 or 3 [amount of narcotics], if you wanna throw me a deuce you can. Uh figure it out by the time I get there."[2] Individual A responded,

---

[2] Some of the intercepted conversations have been summarized in this Affidavit. The language that is quoted from these conversations throughout this Affidavit is based upon a preliminary review of the conversations, and not on final transcripts of the intercepted/recorded conversations. The times listed for the recorded and intercepted conversations are approximate, and unless otherwise noted, are in Central Standard Time. The summaries do not include all statements or topics covered during the course of the conversations. At various points in the Affidavit. I have included in brackets my interpretation of words and phrases used in the intercepted conversations. My interpretations are based on the contents and context of the intercepted conversations, events occurring before and after the conversations, my knowledge of the investigation as a whole,

"Wanna pay for three [amount of narcotics] then and I'll throw you one [amount of narcotics] more?" DODDS replied, "You can throw me two [amount of narcotics] if you can." Individual A responded, "I mean I know if you buy three he gonna throw me one but I'll try to get you two for you baby." DODDS said, "Either way we're good," and Individual A replied, "Let me get something [narcotics] ready for you before you get here."

12. Based on my training, experience, and knowledge of the investigation, I believe that during the above conversation, DODDS asked Individual A to supply narcotics to DODDS, and that Individual A agreed to distribute those narcotics. Further, DODDS and Individual A then discussed the quantity of narcotics Individual A could provide to DODDS.

13. On or about September 17, 2024, at approximately 11:30 a.m., Individual A, using Subject Phone 9, called DODDS, using Target Phone 3. During their conversation, Individual A asked, "Hey is about 12 or 1 [Pacific Time ("PT")] good for you?" DODDS said he was around, and Individual A said he would contact DODDS between 12 p.m. and 1 p.m., PT.

14. At approximately 2:41 p.m., Individual A, using Subject Phone 9, called DODDS at Target Phone 3. Individual A stated, "Come on," and DODDS replied, "Alright cool I'll be leaving now in about 10 minutes." Based on my training, experience, and knowledge of the investigation, I believe Individual A told DODDS to

---

my experience and training, and the experience and training of other law enforcement agents and officers in this investigation.

5

meet Individual A to retrieve the narcotics that DODDS had ordered. DODDS indicated that he was leaving in 10 minutes to meet Individual A to obtain the narcotics DODDS had ordered earlier that day.

15. Later that afternoon, according to intercepts over Target Phone 3, at approximately 4:50 p.m., DODDS received a call from (213)***-8274, subscribed to Individual B at an address on West 127th Street in Los Angeles, California ("Subject Phone 8"). During their call, DODDS said that he was "here," meaning in Los Angeles. DODDS also told Individual B, "Probably gonna need you to work with me some, I know uh, one [amount of narcotics] of the uh rooftops [black tar heroin], one or two [amount of narcotics] of the feddies [fentanyl], and uh five [amount of narcotics] of the uh, uh, uh of the girlfriends [cocaine]." Individual B asked if DODDS had "enough," and DODDS responded, "I got to go count it."

16. Based on my training, experience, and knowledge of the investigation, I believe that in the above conversation, DODDS asked Individual B to supply various quantities and types of narcotics, including black tar heroin, fentanyl, and cocaine to DODDS, and that Individual B asked if DODDS had enough money to pay for the narcotics. DODDS responded that he would have to count the money he had.

17. According to intercepts over Target Phone 3, on or about September 17, 2024, at approximately 5:03 p.m., DODDS called Individual B at Subject Phone 8. During their conversation, DODDS said "85 [$85,000]," and Individual B responded, "Ok you have 85 [thousand]," referring to the amount of money DODDS had to spend on a quantity of narcotics. Individual B then asked, "So what did you wanna get?"

DODDS and Individual B then discussed various types of narcotics. DODDS responded, "I know uh one of my guys wanted 4 [kilograms] C's [cocaine]. I know that's going to take about at least 50 [$50,000] of it." DODDS asked what Individual B would "give me the old girls [cocaine] for right now?" and Individual B said "13.5 [$13,500]." As their conversation continued, DODDS asked, "What about the uh, the uh F [fentanyl]," and Individual B responded, "I could do 17 [$17,000]." DODDS answered, "Alright. 17 [$17,000]. And what about the tar [black tar heroin]?" Individual B, responded that he could do "14 [$14,000] on the tar [black tar heroin]."

18. Based on my training, experience, and knowledge of the investigation, I believe that in the above conversation, DODDS asked Individual B to supply various quantities and types of narcotics, including cocaine, fentanyl, and black tar heroin to DODDS, and that Individual B quoted DODDS prices for various quantities of those narcotics.

19. As their conversation continued, Individual B asked when DODDS wanted to pick up the narcotics. DODDS responded, "The sooner the better. You know put everything add 30 I'm happy." DODDS added that "the C [cocaine], that's what's been slowing me up, that's 90 percent of my calls been uh, been that one," and stated, "and uh you know the F [fentanyl] been picked up and uh the tar [black tar heroin] are just something I like to keep around. They come get 50, 100 [grams], you know they mix it with whatever." Individual B said he would "throw some C [cocaine] on top." DODDS then stated that he would pay Individual B for the drugs via Zelle.

20. Based on my training, experience, and knowledge of the investigation, I believe that in the above conversation, DODDS explained to Individual B that DODDS wanted to pick the narcotics up as soon as possible. DODDS further told Individual B that his customers most commonly order cocaine, but that he likes to have fentanyl and black tar heroin available to sell to customers as well.

21. Later in the conversation, Individual B said, "Yeah you owe me, you owe me 2 of the F [fentanyl] and then the 3K." DODDS asked, "What's K?" and Individual B responded, "You owe me three thousand from the uh previous . . . ." DODDS responded, "Yeah, I give you that. I'm definitely gonna give you the three. I'ma try to uh have somebody Zelle me for for one of the F [fentanyl]." Individual B said he would "set up right now."

22. Based on my training, experience, and knowledge of the investigation, I believe that in the above conversation, Individual B and DODDS discussed that DODDS owed Individual B $3,000 from a prior narcotics transaction. DODDS stated he would give Individual B the $3,000 and that DODDS was trying to get someone to send him additional money via Zelle to pay for the fentanyl.

23. According to intercepts over Target Phone 3, later that day, at approximately 5:07 p.m., DODDS, using Target Phone 3, called Individual B, at Subject Phone 8, and told Individual B to "hold off" on the "rooftop" [black tar heroin] and "just bring me two [kilograms] of the F's [fentanyl] cause that's what's selling the fastest. I can get the tar [black tar heroin] on the next one." DODDS later said, "If you got it, [type of narcotics] I'll take it, but, either way." Individual B responded,

"Yeah, cause I had ordered that one [type of narcotics] cause that's kinda like my order." DODDS replied, "Get it [type of narcotics], get it then, bring it," and said, "I could use it."

24.     Based on my training, and experience, and knowledge of the investigation, I believe that in the above conversation, DODDS told Individual B that he no longer wanted the black tar heroin, but to bring DODDS two kilograms of fentanyl because that is what sells the best with his customers. DODDS indicated he could purchase the black tar heroin during a later visit. They then discussed that if Individual B had a certain type of narcotics, DODDS would purchase that.

25.     According to intercepts over Target Phone 3, about a minute later, at approximately 5:38 p.m., Individual B, using Subject Phone 8, called DODDS at Target Phone 3, and stated, "I got one of my um, one of my guys there with the, with the rooftop [black tar heroin], and then I'll fill up the rest of the order right now. Give me a couple of hours." DODDS asked if he should "come out," and Individual B said, "I told him go in the parking lot, he's in the uh, black Hyundai." Ten minutes later, Individual B called DODDS from Subject Phone 8. During their conversation, DODDS stated, "Yeah it's finished."

26.     Based on my training and experience and familiarity with this investigation, I believe that in the above conversation, DODDS picked up narcotics in a parking lot from a courier sent by Individual B. Based on Target Phone 3's location information, DODDS appeared to be at Hotel A located near the Los Angeles airport.

27. According to intercepts over Target Phone 3, at approximately 6:54 p.m., Individual B, using Subject Phone 8, called DODDS at Target Phone 3. During their conversation, Individual B stated, "I'm right here on uhh, on two," and DODDS responded, "Alright cool here I come." DODDS said he was "walking in the lot," and a few seconds later said, "Yeah I see you now."

28. According to intercepts over Target Phone 3, at approximately 7:33 p.m., Individual B, using Subject Phone 8, called DODDS at Target Phone 3. During their conversation, Individual B said, "my guys like five minutes," and "I just moved up to, uh, three." Individual B repeated, "He's about, yeah, he's about five minutes, so if you wanna start kinda, uh, coming out."

29. Based on my training, experience, and knowledge of the investigation, I believe that in the above two conversations, DODDS met up with Individual B two more times in the same parking lot and possibly met with a supplier of Individual B during the second meeting.

**C. On or About September 19, 2024, DODDS Discussed With Individual B Obtaining Additional Narcotics That DODDS Planned to Ship Back to Illinois**

30. According to intercepts over Target Phone 3, on or about September 19, 2024, at approximately 2:05 p.m., Individual B, using Subject Phone 8, called DODDS at Target Phone 3. During their conversation, Individual B stated, "I should get you right today, by like 2-3 o'clock [PT]." DODDS responded, "Ok, ok let me know." Individual B then said, "ok my bad, my boy just little nagging it on me and shit." DODDS stated, "yeah yeah yeah," to which Individual B responded, "but I'll get you

10

right for sure today." DODDS then said, "alright let me know so I can put it together and it get it out of here." Individual B responded, "alright cool cool."

31.     Based on my training, experience, and knowledge of the investigation, I believe that in the above conversation, Individual B told DODDS he could supply DODDS with the rest of the narcotics that DODDS previously ordered at approximately 2:00 p.m. or 3:00 p.m. PT that same day. DODDS then told Individual B that he wanted to get the narcotics so DODDS could "get it out of here," meaning to ship the narcotics out of California.

**D. On or About September 20, 2024, DODDS Contacted Business A to Determine When The Narcotics DODDS Purchased in Los Angeles Would Be Delivered to Illinois**

32.     On or about September 20, 2024, at approximately 12:14 p.m., DODDS, using Target Phone 3, placed an outgoing call to a number ending in 8768 ("UM-8768").[3] During their conversation, UM-8768 answered the call identifying the name of Business A.  DODDS replied, "Hi, Urban Express. I'm waiting on a couple boxes." UM-8768 asked for the cargo number. DODDS replied, "I don't have it, uh, I got to dig it out of this luggage real quick hang on one second. It's coming from LA . . . (unintelligible) . . . hang on. Cargo number is 010205558." UM-8768 said, "That one is going to come next week." DODDS asked, "Next week? Probably the beginning of the week?" UM-8768 replied, "Yup."

---

[3] According to a recent Google search, the number ending in 8768 is a published phone number of Business A located in Skokie, Illinois.

33.     Based on my training, experience, and knowledge of the investigation, in the above conversation, I believe that DODDS called Business A, located in Skokie, Illinois, to determine when the narcotics he had purchased in Los Angeles would arrive in Illinois, specifically, at Business A.

### E. DODDS Discussed the Narcotics He Shipped from California to Illinois with His Narcotics Customers

34.     On or about September 20, 2024, at approximately 6:18 p.m., DODDS, using Target Phone 3, placed an outgoing call to a phone number ending in 4608 ("UM-4608"). During their call, UM-4608 asked DODDS, "You think um you think number three [type of narcotic]? Somebody wanna come but I I should I wait 'til Monday or do you think number three [type of narcotic] can stand a punch or two?" DODDS replied, "I'll be at the crib in like five minutes. I go and see what all I got left. All of em [the narcotics] decent it's just uh that monster be here Monday [September 23, 2024]."

35.     Based on my training, experience, and knowledge of the investigation, I believe that in the above conversation UM-4608 asked DODDS to supply him with narcotics and DODDS agreed. DODDS explained he had to check on his current narcotics supply and told UM-4608 that additional narcotics would arrive on Monday (September 23, 2024), but that the quality of the current narcotics was good.

36.      On or about September 21, 2024, at approximately 9:14 a.m., DODDS, using Target Phone 3, received an incoming call from a phone number ending in 5155 ("UM-5155"). During their call, UM-5155 asked DODDS, "Hey listen, put me a hundro [amount of narcotics] together on the mighty." DODDS confirmed receipt of

12

the order. UM-5155 then asked, "Is this the new one [new narcotics shipment] or is this the old one?" DODDS replied, "The new one [narcotics from Los Angeles] be here on Monday." UM-5155 then said, "Let me see if I can, if I can hold these cats off I'ma hold 'em off, but if I can give something to hold them over then that's what I wanna do. I don't want them to go nowhere. (inaudible) OK I aint mad at it, it is what it is. Yeah it is what it is, so uh, but anyway just put just put it together. You're going to have to take it probably to uhh uhh the restaurant."

37.     Based on my training, experience, and knowledge of the investigation, I believe that in the above conversation UM-5155 asked DODDS to supply him with narcotics, and DODDS agreed. UM-5155 then asked if the narcotics would come from DODDS' current narcotics supply or from DODDS' resupply. DODDS told UM-5155 the new narcotics supply would arrive on Monday (September 23, 2024). UM-5155 then told DODDS he would purchase narcotics from DODDS' current narcotics supply to sell to UM-5155's customers so that the customers did not try to find a new drug source.

### F.  On or About September 23, 2024, DODDS Traveled to Business A and Picked Up Three Parcels Containing Narcotics

38.     On or about September 23, 2024, based on location data for Target Phone 3, and law enforcement surveillance, at approximately 1:00 p.m., DODDS rode in a vehicle driven by Individual M from the area of Hospital A, located in Chicago, Illinois, to Business A, in Skokie. After DODDS arrived at Business A, he entered Business A's company building. As observed by law enforcement conducting physical surveillance, DODDS paid the freight charge for three parcels (collectively, "the

Parcels"). Based on information provided by Business A, the Parcels were addressed to "Urban Express,"[4] the company DODDS referenced when he called Business A on September 20, 2024, to inquire about a cargo shipment originating from Los Angeles. Further, the outer packaging of the Parcels listed the telephone number assigned to Target Phone 3, a phone used by DODDS.

39. Based on law enforcement surveillance, after paying for the Parcels, DODDS exited Business A. DODDS then entered the passenger seat of Individual M's vehicle, and the vehicle traveled to a rear loading dock of Business A. DODDS then exited the passenger side of the vehicle and picked up one of the three Parcels from the loading dock. DODDS placed that parcel into the backseat of the vehicle. After DODDS placed the first parcel into the vehicle, law enforcement approached and detained DODDS and Individual M. Law enforcement then recovered the parcel that DODDS had placed in the vehicle, as well as the two remaining parcels, which had remained on the rear loading dock of Business A.

40. Based on law enforcement observations, each of the Parcels were addressed to Urban Express and each had Target Phone 3 listed on their respective shipping labels.

41. According to law enforcement, the Parcels bore a total of $69.65 in postage. Additionally, each of the Parcels were approximately 17 inches, by 17 inches,

---

[4] According to law enforcement databases, DODDS had a Limited Business License through the City of Chicago as the owner of Urban Express in 2007 and 2008. Additionally, as discussed in more detail above, on or about September 20, 2024, DODDS placed an outgoing call to Business A upon his return from California and indicated that he was calling on behalf of Urban Express to determine when "a couple boxes" would be delivered.

14

by 17 inches, and each parcel weighed approximately 25 pounds (combined weight approximately 75 pounds).

42. Law enforcement officials detained DODDS and Individual M and transported them to the FBI Chicago Field Office. DODDS and Individual M were released from custody later that same day on September 23, 2024, without charges pending the ongoing investigation.

43. DODDS was identified by law enforcement as the person at Business A by comparing him to prior surveillance images as well as comparison to his driver's license photograph maintained by the Illinois Secretary of State.

44. On or about September 23, 2024, I arranged for a Cook County Sheriff's Police Department Canine Officer and his canine partner, Aris, to meet FBI Agents and examine the Parcels at Business A.[5] FBI Agents, together with the Canine Officer arranged a controlled substance detection test on the Parcels. During the controlled substance detection test Aris examined the parcel that DODDS had placed in the back seat of the vehicle and alerted to this parcel by sitting/laying down next to that parcel. The Canine Officer informed FBI Agents that Aris's actions indicated the presumptive presence of narcotics and/or controlled substances in that parcel. During the controlled substance detection test Aris also examined the two remaining parcels

---

[5] According to the Cook County Sheriff's Police Officer, Aris was certified by the North American Police Work Dog Association as a narcotics dog. Before the alert at Business A, Aris was most recently re-certified on March 27, 2024. Aris is trained to sniff buildings, vehicles, envelopes, and wrapped parcels to detect the odors of heroin, cocaine, marijuana, methamphetamine, and other controlled substances that could be contained inside. Aris is also trained to indicate the presence of such substances or their scents by alerting to the item he is sniffing.

that were seized from the rear loading dock of Business A. Aris also alerted to these two remaining parcels by again sitting/laying down next to them. The Canine Officer informed FBI Agents that Aris's actions indicated the presumptive presence of narcotics and/or controlled substances in these two remaining parcels. FBI Agents then took custody of the three Parcels.

45. On or about September 25, 2024, U.S. Magistrate Judge Valdez authorized a search warrant for the Parcels (Case No. 24 M 745). On approximately September 26, 2024, law enforcement officers searched the Parcels. One of the parcels contained a plastic bin containing six heat-sealed packages. With respect to the remaining two parcels, one parcel had seven brown colored glass bottles and the other had eight brown colored glass bottles.

46. Law enforcement officials provided the bottles and packages seized from the Parcels to the Drug Enforcement Administration ("DEA") laboratory for testing. The DEA Laboratory identified that, collectively, the Parcels contained the following substances:

a. Approximately 1,004 grams of fentanyl, a Schedule II Controlled Substance;

b. Approximately 4,006 grams of cocaine, a Schedule II Controlled Substance;.

c. Approximately 898 grams of heroin, a Schedule I Controlled Substance; and

16

d. Approximately 442 grams of phencyclidine ("PCP"), a Schedule II Controlled Substance.

47. Based on my training, experience, and knowledge of the investigation, the quantities of narcotics recovered from the Parcels are not consistent with user quantities of fentanyl, cocaine, heroin, or phencyclidine, but rather these quantities of narcotics are indicative of drug distribution.

**II. CONCLUSION**

48. Based on the foregoing, I respectfully submit that there is probable cause to believe that, on or about September 23, 2024, WILLIAM DODDS knowingly possessed with intent to distribute a controlled substance, namely, 400 grams or more of a mixture and substance containing a detectable amount of fentanyl, (N-phenyl-N-[1-(2-phenylethyl)-4-piperidinyl] propanamide), a Schedule II Controlled Substance, in violation of Title 21, United States Code, Section 841(a)(1).

FURTHER AFFIANT SAYETH NOT.

*Michael Ganley*

MICHAEL GANLEY
Special Agent, Federal Bureau of Investigation

SWORN TO AND AFFIRMED by telephone June 29, 2026.

Honorable GABRIEL A. FUENTES
United States Magistrate Judge

17